### IN THE DISTRICT COURT OF OKLAHOMA COUNTY
### STATE OF OKLAHOMA

**ROBERT WILLIAMS**, an individual,       )
                                          )
      Plaintiff,                    )
                                          )
v.                                        )       Case No. **CJ-2022-2297**
                                          )
**TOWN OF JONES CITY**, an Oklahoma        )       FILED IN DISTRICT COURT
municipality;                             )       OKLAHOMA COUNTY
**RAY POLAND**, an individual;             )
**CHRIS CALVERT**, an individual;          )       MAY **16** 2022
**FRANK KOEHLER**, an individual;          )
**MISSY WILKINSON**, an individual;        )       RICK WARREN
                                          )       COURT CLERK
      Defendants.                   )       109 _____

## PETITION

Plaintiff, Robert Williams ("Plaintiff"), submits the instant Petition asserting his causes of action against the Defendants, Town of Jones City, an Oklahoma municipal corporation (the "Town"), and Ray Poland, Chris Calvert, Frank Koehler, and Missy Wilkinson (collectively, the "Board Members"), and further alleges and states as follows:

### JURISDICTION AND VENUE

1.    Plaintiff, the former Town Chief of Police of the Town, brings this action against the Town and against each of the individual Board Members. Plaintiff sues pursuant to: (*i*) the Oklahoma Governmental Tort Claims Act, 51 O.S. § 150 *et seq.*; (*ii*) U.S. Const. Amend. I, V, and XVI; (*iii*) Okla. Const. Art. II, §§ 2, 7, and 22; (*iv*) 28 U.S.C. § 1983; and (*v*) Oklahoma statutory provisions and common law governing his tort claims described hereinbelow.

2.    Pursuant to 12 O.S. § 2004(F), jurisdiction is proper in this Court.

3.    Venue is proper in this Court as Plaintiff is a resident of Oklahoma County, and all of the events or omissions giving rise to Plaintiff's claims occurred in Oklahoma County.

**EXHIBIT 2**

## PARTIES

4.     Plaintiff is a citizen of the State of Oklahoma who resides and otherwise maintains a permanent address in the Town of Jones, Oklahoma County.

5.     Defendant Town is an Oklahoma municipal/political subdivision located in Oklahoma County and organized under the laws of the State of Oklahoma.

6.     Defendant Ray Poland is the current Mayor of the Town of Jones and who, upon information and belief, resides or otherwise maintains a permanent address in Oklahoma County.

7.     Defendant Chris Calvert is a current member of the Town of Jones Board of Trustees who, upon information and belief, resides or otherwise maintains a permanent address in Oklahoma County.

8.     Defendant Frank Koehler is a current member of the Town of Jones Board of Trustees who, upon information and belief, resides or otherwise maintains a permanent address in Oklahoma County.

9.     Defendant Missy Wilkinson is a current member of the Town of Jones Board of Trustees who, upon information and belief, resides or otherwise maintains a permanent address in Oklahoma County.

## FACTUAL ALLEGATIONS
### *Introduction to the Plaintiff's Claims*

10.     On May 25, 2021, Defendants wrongfully terminated Plaintiff from his position as the Town's Chief of Police.

11.     Defendants terminated Plaintiff in unabashed retaliation for—and as a direct response to—his public, protected speech critical of the manner in which the Town responded to and investigated rampant fiscal mismanagement and misconduct afflicting the Town's fiscal administration.

2

12. Put more plainly, Defendants terminated Plaintiff's employment *because* he continually sought to advance a formal inquiry into the suspicious disappearance of Town funds. In contrast, the Town and its Board Members dragged their feet in investigating the same.

13. As Plaintiff worked to advance a formal investigation into the unexplained loss of Town funds, his daughter Sarah Boggs ("Sarah"), who operated the Town's only source of local journalism, The Jones Journal, increased her own efforts to investigate the Town's finances. She persistently exercised her rights under the Oklahoma Open Records Act to obtain information pertinent to the Town's fiscal mismanagement and irresponsibility.

14. Notably, during the closed-door meeting in which the Board Members purportedly terminated Plaintiff "for cause," the first complaint raised was Sarah's alleged "excessive" use of Open Records Act Requests to look into the Town's conduct and finances.

15. The closed-door meeting in which the Board Members wrongfully terminated Plaintiff's employment as the Town's Chief of Police occurred without sufficient notice to Plaintiff. The Board Members conducted the meeting in a manner that denied Plaintiff the proper opportunity to address the pretextual and absurd complaints asserted against him.

16. Defendants denied Plaintiff *any* pre-notice opportunity to hear or address the complaints raised at the closed-door meeting; as such, Defendants failed to provide Plaintiff with any real opportunity to prepare a defense to those complaints.

17. Defendants outright denied Plaintiff's attorney access to the closed-door meeting in which Plaintiff was terminated. Notwithstanding the fact that Plaintiff had specifically retained an attorney to represent his interests and advise him of his rights during that meeting.

18. Restated, and as will be addressed in greater detail herein, Defendants *so* took issue with Plaintiff's work to compel an audit related to the misappropriation of Town funds by a former

employee (or employees) *in an amount potentially exceeding $300,000.00*, that they instead conducted a biased "audit" of Plaintiff's *own work* for the sole and express purpose of contriving a pretextual basis to terminate his employment altogether and otherwise silence Plaintiff's protected speech addressing a matter of undeniably public concern.

19.     Apparently unsatisfied by the termination of Plaintiff's employment, Defendants' retaliation continued, as the Board Members subsequently publicly disparaged the Plaintiff by advising the Town community that his termination had been justified "for cause" and that the Town would be opening an investigation into the internal workings of the Town Police Department, thereby wrongfully and irreparably damaging Plaintiff's ability to find and maintain gainful employment in law enforcement, a profession to which Plaintiff has faithfully dedicated the majority of his adult life. The Town further imposed penal fees upon any party seeking Open Records Act Requests to pay for a legal opinion and review by the Town's attorney concerning the documents sought in the request.

20.     Defendants' actions were grossly inappropriate under the circumstances and unsupported by federal and state law. Defendants' efforts to conceal the Town's problems resulted in the wrongful impairment of Plaintiff's good reputation and now compels Plaintiff to defend same *via* the filing of this suit.

### *The Town's Financial Mismanagement*

21.     The Town has long suffered from poor record-keeping practices and inadequate financial controls, thereby making it susceptible to the misappropriation of Town funds by the Town's employees.

22.     These risks had been *repeatedly* raised as a concern by the Town's annual private audits, which had found year after year that the Town employed inadequate internal financial

control measures aimed at combatting fraud, embezzlement, and other related financial crimes and torts. These identified problems included, but were not limited to: (*i*) posting errors and inappropriate account balances in the General Ledger; (*ii*) unsupported valuation claims relating to capital and/or property held by the Town; and (*iii*) discrepancies between the recording of police fines and fees and the collections relating to those fines and fees.

23.     In the Annual Auditor's Report released on June 13, 2019, the Town's annual auditor disclosed the following:

> During fiscal year 2019, town employees discovered discrepancies concerning the recording of police fines and fees and the collections relating to those fines and fees. An investigation concerning these discrepancies has been instituted but is not yet complete. Town officials believe the amounts related to fiscal year 2018 are not material to the financial statements, but that the amounts related to fiscal year 2019 may be material to those financial statements. At this time, an amount cannot be determined, but the investigation should be completed before the end of 2019.

*Town of Jones City Audit Report* (released June 13, 2019).

24.     The following year, the Town's annual auditor's report (for the year ending on June 30, 2019) included the following finding in its **Schedule of Findings and Responses**:

> Because there is not sufficient segregation of duties between those maintaining the court records, performing reconciliations, or collecting payments, and no compensating procedures to provide for oversight or review of those transactions, discrepancies between the recording of police fines and fees and collections relating to those fines and fees have been discovered.

*Town of Jones City Audit Report* (released May 28, 2020).

25.     The Town possessed several means by which it could implement new controls to ensure the security of its public resources and even employed an individual (or individuals) at the taxpayer's expense to assist in these matters. Still, the Town nonetheless persistently failed to change its practices or otherwise address the findings above.

26.     Upon information and belief, the checks and balances and financial controls that would have prevented the aforementioned irregularities had previously existed *but were removed* by the Town to accommodate and ease the work responsibilities of the Town's Clerk, who was closely connected within the Town and to the Board Members.

27.     At all times pertinent hereto, the Town *knew* that its lack of financial controls posed significant risks to the Town's finances—because it had already identified discrepancies resulting from its lack of controls which it could not otherwise explain.

28.     The Town employed a Court Clerk (the "Court Clerk")—a close affiliate and personal friend of the Town Clerk and other well-connected locals for a lengthy period of time up until early 2018.

29.     This Court Clerk oversaw the Town's receipts of police-issued fines and fees that were the subject of the above discrepancies, *i.e.*, missing money. The Town ended its employment relationship with the Court Clerk shortly after the Plaintiff was hired as its Chief of Police but prior to the *public* release of the above-discussed audit findings.

30.     Upon information and belief, the Court Clerk encouraged citizens to pay certain fines and fees owed to the Municipal Court, including, but not limited to, traffic citations and other similar fees and fines, *in cash*. To do so, the Court Clerk would offer discounts to cash-paying individuals on certain fines and fees.

31.     Predictably, accounting irregularities and issues arose in connection with the Court Clerk's improper promulgation of cash payments.

32.     When the Town's Deputy Court Clerk uncovered the aforementioned irregularities and the Town subsequently confronted the Court Clerk, the Court Clerk did not respond to the

6

suggestion of impropriety with a rejection or repudiation of the thought; rather, the Court Clerk offered to repay any amounts the Town believed to have been mishandled.

33.     Upon information and belief, the Defendants were fearful that any investigation into the Court Clerk would reflect poorly on others within the Town who possessed close connections to the Court Clerk.

34.     As the Court Clerk had been the *only* Town employee tasked with handling the receipt of and accounting for these funds—despite other employees being available to assist with or conduct said tasks—the investigation into the extent of any wrongdoing was beyond both the scope of the Town's annual audits and the ability of its current employees.

35.     Because the Town's financial and accounting records simply did not add up, trained auditors were required to ascertain and uncover the cause and extent of the discrepancies.

36.     The Town, in response to both its concerns and the Auditor's findings, responded to the audit with the followings statement:

> We have instituted an investigation of all of our court records, including tracing all tickets to court dockets, payment receipts and/or time payment agreements and to our ODIS software for the last three years. Once that investigation is completed, we will determine what policies and procedures we need to institute to prevent future defalcations and discrepancies.

The Town ultimately retained the same firm which prepared its annual audits to perform a *private* audit investigating the subject fiscal discrepancies.

37.     Plaintiff felt encouraged by the Town's retention of a private auditor to perform a detailed accounting of the Town's records and regularly sought updates from the Town concerning the status of the private auditor's work.

38.     Plaintiff advised the Town that as soon as the private auditor's findings were complete, his office could proceed with its own investigation into any possible criminal liability.

Plaintiff assigned his Deputy Chief, Les Warren, as the Town's department investigator of the matter.

39.     Time and again, Plaintiff sought updates from the Town Clerk and the Town's Mayor regarding the private audit. Plaintiff even advised the Mayor of the need to move quickly in completing the audit to ensure the Town's claims associated with any financial mismanagement would not be time-barred by the relevant statute(s) of limitations.

40.     The Town repeatedly advised Plaintiff that the private auditor's work was ongoing and that Plaintiff need not worry himself over the matter. The Town further advised Plaintiff not to speak on the matter publicly because it was confidential.

41.     Nevertheless, Plaintiff repeatedly sought updates and kept a watchful eye on the work performed by Town employees to assist in the private auditor's work, or—as it turned out—the lack thereof.

42.     Plaintiff observed, for instance, the Town Clerk and Deputy Court Clerk mishandle relevant financial documents, including all pertinent court records related to the police fines and fees at issue, by strewing about said documents across the Town's offices absent any controls or limitations on who may have access to same. And, as Plaintiff further noted, the Town Clerk and Deputy Court Clerk continued to move the records around the office for months under similar circumstances.

43.     Rather than provide all relevant financial records and documents to the private auditor for review, the Town Clerk first reviewed each individual relevant document piecemeal before ultimately setting aside for review *only* those documents that the Town Clerk found to be pertinent.

### *Plaintiff's Actions to Advance the Audit into the Town's Finances*

44.     More than a year after the Town had initiated the private audit, after having noticed that the private auditor had visited the Town's offices on only a few occasions, witnessed the issues associated with the chain of custody of the pertinent records by the Town Clerk, and with no progress appearing to have been made, Plaintiff directed his Deputy Police Chief, the lead investigator of the matter, to contact the Oklahoma State Bureau of Investigations ("OSBI") to report the Town's concerns and otherwise obtain assistance from OSBI investigators in reviewing the Court Clerk's work and assisting in the same work that was supposed to be performed by the private auditor.

45.     The Deputy Police Chief complied with Plaintiff's request and made the request for OSBI's assistance on or about September 23, 2020.

46.     OSBI promptly initiated its investigation and ratified the Town's private auditor's concerns and findings. In fact, OSBI advised Plaintiff that the amount of the Town's financial discrepancies exceeded $300,000.00.

47.     Due to the number of records at issue and the extent of the amount in controversy, OSBI further advised the Town of the limitations of its own capabilities to continue the necessary investigation. Accordingly, OSBI recommended the Town request a formal audit and investigation of the specific discrepancies found by OSBI from the State Auditor's Office—an investigation entirely distinct from the annual audits performed for the Town.

48.     Following its receipt of OSBI's recommendation, the Board Members voted to refer the matter to the State Auditor's Office for further investigation on January 5, 2021.

49.     Upon information and belief, the private audit purportedly sought by the Town—an audit paid for by taxpayer funds—was never fully completed.

50.     Upon information and belief, Defendants possessed no interest in the private auditor actually completing its work.

51.     Upon information and belief, Plaintiff's affirmative referral of the relevant matter to OSBI compelled the Town to *finally* take action concerning its longstanding history of financial mismanagement.

52.     Further demonstrating Defendants' relative lack of concern over the matter, despite voting to approve referral of the matter to OSBI on January 5, 2021, neither the Town nor its Board Members acted upon that vote to advise the State Auditor's Office of the issue until February 26, 2021, *i.e.*, it took over one month for the Town to finally place the Auditor's Office on formal notice of the Town's request.

53.     And it was not until March 26, 2021—*another* month later—that the Town filed the necessary paperwork with the State Auditor's Office to actually initiate the audit requested.

54.     Errors plagued the Town's request, as the form(s) submitted contained incorrect attachments. The Town failed to correct these errors *for yet another month*—not until April 27, 2021.

55.     After receiving the complete, *corrected* forms on April 27, 2021, the State Auditor's Office finally queued the Town's request.

56.     Because the State Auditor's Office advised of a potential eighteen (18) month waiting period *before* it was able to conduct the requested audit, upon information and belief, as of the filing of this lawsuit, the Office's audit has begun but is not yet complete.

### *Additional Inquiries into the Discrepancies within the Town's Finances*

57.    On one occasion, prior to his termination, Plaintiff discussed the details of the audit requests with a then-current Town board member (who had lost re-election) while eating at a local dining establishment called "Shuff's." The Town's mayor observed this conversation and later advised Plaintiff to cease further discussion concerning "city affairs" with said board member. This instruction echoed the prior references by the Town to Plaintiff not to discuss the investigation and to generally not concern himself with the pace and progress of the private auditor's work.

58.    As referenced in the Introduction above, Plaintiff's daughter, Sarah, was well aware of the repeated problems identified in the annual audits of the Town's finances, the slow pace of the Town's actions to remedy the same, and Plaintiff's efforts to speed up the process (including Plaintiff's request for OSBI assistance).

59.    At all times pertinent herein, Sarah was the owner and editor of the Town's sole local news source, a private blog titled: "The Jones Journal." On this blog, Sarah released a number of articles and posts related to the audit findings. Sarah also published an opinion piece criticizing Defendant's efforts to raise additional Town revenues via an increase in sales taxes as "regressive," explaining that such a move would be harmful to the Town's prosperity, and certainly should not be implemented while there remained ongoing concerns over the Town's financial controls.

60.    Sarah submitted a number of Open Records Act Requests to the Town seeking information pertinent to the Town's investigation of the various financial problems discussed hereinabove. Sarah further sought regular commentary from the Defendant Board Members, as well as others employed by the Town, including Plaintiff, in relation to these issues.

61.     Sarah's efforts persisted for months and ultimately culminated in Plaintiff's termination. Sarah submitted an email to the Town and all of the Board Members at 9:09 a.m. on Friday, May 21, 2021, stating the following:

> Dear Trustees,
>
> I wanted to reach out to you again in an effort to help our community. I have hesitated to send another message because I fear that you are no longer listening. It is discouraging. . . . I know that many of you were not thrilled with the article I published from the Public Forum last week. If feelings were hurt, I am truly sorry for that. I do stand by my article and the facts/quotes that were used. . . . If you feel that my article was disingenuous, as always, I offer you the opportunity to issue a response. . . .
>
> Here is a new issue we need to address. Before the 2020 Audit report will be presented to the Board in June, I encourage each of you to review the past years audit findings, and see if any of the financial control issues have been addressed. The audit reports show year after year that the Town has the same deficiencies in their financial controls and procedures. To continually have repeat findings and shrug it off saying "We aren't Oklahoma City," is reckless. . . . This leads me to my next point. As a result of these deficiencies, the Town is now under investigation with OSBI and the State Auditor's Office. This is no small matter. I have sent a public information request to the Jones City Clerk and the Jones attorney for copies of the recent local investigation into the court records (as referenced in Audit Finding 2019-1 on page 21). There have been some serious mishandlings of the public funds, and I believe it is my responsibility to shine a light on these issues. . . .
>
> I know these are not easy topics to discuss, and I know that each of you are trying to do your best to help our town. Please know that I am also doing the same. . . .

62.     *Just seven hours* after Sarah submitted the foregoing request, the Town posted a public notice of a special meeting to occur just four (4) days later, on Tuesday, May 25, 2021. At this meeting, the Town would ultimately terminate Plaintiff's employment.

63.     Additionally, upon information and belief, Sarah's Open Records Act Requests (including the foregoing request) culminated in the Town's implementation of a new, illegal, and impermissible fee regime in responding to said requests. Specifically, the Town imposed a fee upon anyone submitting an Open Records Act Request to pay the Town for the costs of a legal

opinion addressing the request and/or for a review of such request(s) by the Town's attorney. This fee is intended to disincentive citizens—Sarah, in particular—from seeking public records of all kinds, but particularly those related to the Town's history of fiscal and financial mismanagement.

64.     The Town has ceased responding to Sarah's Open Records Act Requests, as most of these requests remain outstanding in violation of Oklahoma law.

### *The Plaintiff's Wrongful Termination*

65.     On May 25, 2021, the Defendant Board Members—Ray Poland, Chris Calvert, Frank Koehler, and Missy Wilkinson—held a special meeting to terminate Plaintiff as the Chief of Police for the Town of Jones City (the "Meeting"). Non-Party Board Member, Casey Burwell, was absent from attendance at the Meeting.

66.     The Town did not specifically notify Plaintiff that the Meeting was scheduled. Plaintiff did not discover this fact *until the day prior* (Monday, May 24, 2021), when the Town Inspector advised Plaintiff that he had seen the Meeting's Agenda posted on the office door after Plaintiff had left for the day the prior Friday evening.

67.     The only item on the Meeting's Agenda noticed a discussion concerning Plaintiff's "employment, hiring, appointment, promotion, demotion, disciplining, or resignation." Apart from the fact that the Meeting concerned his employment, Plaintiff had no idea what the intended purpose of the Meeting was or what matters may be addressed at that time.

68.     After learning of the meeting, Plaintiff even quipped to the Town Clerk, whose desk sits between Plaintiff's and the Town Inspector's: "Am I being fired?" The Town Clerk responded: "No one is getting fired." Plaintiff genuinely had no reason to believe the Meeting concerned his termination. Indeed, the Town's Meeting notice failed to even include the designation that his "termination"—as opposed to say his "disciplining"—was contemplated.

69.     At approximately 11:45 a.m., that same morning, the Town's Mayor texted Plaintiff, asking him to meet at 4:30 p.m. that same day. Plaintiff agreed.

70.     The Town Mayor opened his meeting with Plaintiff with an advisement that the Town Board sought to go "in a different direction" with respect to the role of Police Chief.

71.     Plaintiff was confused and presented his sentiments to the Mayor that a change of direction made no sense in consideration of Plaintiff's job performance. Plaintiff even advised the Mayor of individual meetings with Board Members, Frank Koehler, Casey Burwell (non-party), and Chris Calvert, wherein each of them represented to Plaintiff (*i*) their happiness with the operation and direction of the Town Police Department; and (*ii*) their specific approval of the Plaintiff's push to increase officer pay.[1]

72.     Pushing back, the Town's Mayor affirmed the Board Member's desire to part ways and advised that the Town's attorney had prepared a letter of resignation for Plaintiff's execution. However, no copy of the letter was provided to Plaintiff, and Plaintiff responded that he would not feel comfortable resigning.

73.     Offended at the suggestion that he *ought* to resign, Plaintiff continued to ask the Mayor *why* he was being asked to resign. Plaintiff tried to explain *how* the Police Department's position had improved since his hiring and even engaged in a brief discussion concerning his predecessor in an effort to draw a stark comparison between the two and highlight the unique problems Plaintiff inherited.

---

[1] Plaintiff had been pushing the Board Members to increase officer pay for some time, as he had lost three well-trained officers—*officers trained at the Town's expense*—to other law enforcement agencies due to the Town's low wages, including the lack of even a cost-of-living increase. These concerns had been ignored during his tenure, and then promptly agreed to shortly after his termination.

74.     The Mayor declined the opportunity to engage in a discussion with Plaintiff concerning the merits of the Defendants' decision to terminate his employment. The Mayor generally refused to provide any explanation for the demand that Plaintiff resign at that time, instead repeating that the Town needed to make a change.

75.     Plaintiff even raised the issue of his ongoing efforts to investigate the Court Clerk. However, the Mayor responded curiously, stating: "I thought you said you couldn't investigate [her]." Plaintiff refuted this suggestion.

76.     Absent any resolution of the matter, Plaintiff advised that he wanted to speak to his wife before he would sign any resignation letter.

77.     The next day, Plaintiff retained the services of an attorney to represent his interests at the Meeting. Upon the Meeting's initiation, the Board Members immediately entered into an executive session lasting approximately two hours. Up to and including the time period in which the Board members were engaged in an executive session discussing Plaintiff's employment with the Town's attorney, no grounds for any adverse employment action had been raised with Plaintiff. Plaintiff thus had no ability to prepare any response to any concerns that may have been held by the Town.

78.     Approximately two hours after the Meeting began, the Town's attorney invited Plaintiff into the Board Members' executive session *alone*, while simultaneously denying admission and/or access to the meeting to Plaintiff's legal counsel, Mr. Justin Mai, who was present and prepared to advocate on Plaintiff's behalf or otherwise provide him counsel. Over both Plaintiff and his counsel's objection, Mr. Mai was denied access to the meeting or representing Plaintiff during the proceeding.

79.     Due to Defendants' late provision of notice of the Meeting and lack of any pertinent information related to the grounds for any adverse employment decision within the agenda, Plaintiff had *less than one day* to investigate the reasoning for his termination and otherwise undertake any effort to prepare for the relevant Meeting, and just thirty (30) minutes (during which time the Board Members accosted him), to respond to Defendants' purported concerns pertaining to his employment. Any objections would have been futile. The Board Members' decision had already been made the prior Friday when it secretly noticed the Meeting to occur early the following week. Plaintiff, thus, had no *real* opportunity to defend himself, address the baseless allegations asserted against him, or otherwise fight for his job.

### *The Town's Contrived Reasons for Plaintiff's Termination*

80.     While working as Police Chief, Plaintiff ran up against repeated obstacles in the form of "small-town politics" that undermined his operation of the Police Department pursuant to his original charge from the Board Members, specifically including Ray Poland, who had asked upon his hiring that he serve the whole town, as opposed to any particular interest or person therein.

81.     During the Meeting in which Defendants ultimately terminated Plaintiff's employment, Defendants accused Plaintiff—*without evidence*—of improperly accepting $100.00 donations from a local company, Madewell & Madewell, Inc. ("Madewell"), to provide to members of the Police Department as Christmas gifts. However, as Plaintiff explained, <u>Madewell had been providing these gifts to *all Town employees* for years</u> prior to his hiring. In fact, in the years prior to Plaintiff's hiring, Town community members publicly debated whether volunteer members of the Town's Fire Department *should or should not* receive the Madewell gifts, as they were not Town employees but otherwise felt entitled to Madewell's generosity. Other Town employees looked forward to the gift, and would come to the Town offices routinely near

Christmas asking if it had been issued yet. Upon information and belief, the Town took no adverse employment action against any other Town employee who received or allowed another Town employee to receive a Madewell gift (or gifts).

82.    In the Meeting, Defendants also admonished Plaintiff for the mistaken actions of a particular subordinate, who Plaintiff had previously tasked with the acquisition of tasers for official Police use. In seeking the acquisition of tasers, a vendor convinced Plaintiff's subordinate to purchase the tasers *not* with immediately available funds (as Plaintiff had expected), but with credit. At all pertinent times, Plaintiff was entirely unaware of the manner in which the subordinate acquired the tasers, as Plaintiff knew Town funds were immediately available and set aside to pay for the same.

83.    Upon information and belief, the Town Clerk previously entered into a similar credit-based arrangement in purchasing computers for the Town, albeit were no allocated funds existed to pay for said computers. As Plaintiff understands, Defendants took no adverse employment action against the Town Clerk *or* against the subordinate employee who assented to these or similar credit-based agreement(s).

84.    The last complaint raised by Defendant Board Members during Plaintiff's surprise termination proceeding concerned an incident of purported "insubordination" involving Defendant Missy Wilkinson. Like the other complaints explained herein, however, the Town contrived this allegation of insubordination as a pretextual basis for terminating Plaintiff.

85.    Specifically, the Board Members confronted Plaintiff with a prior disagreement between him and Defendant Missy Wilkinson—a disagreement arising out of Plaintiff's handling of an automobile accident near the Town's Elementary School—specifically, an automobile-pedestrian accident which the Police attributed solely to driver negligence (the "Accident"). In

response to the Accident, Defendant Wilkinson, unilaterally—*i.e.*, not via any official approval by the Town's Board Members or on behalf of the Town—sought the permanent appointment of a Police Officer at the Town Elementary School at select times to deter such negligence. Plaintiff took the matter under advisement and advised Defendant Wilkinson that a Resource Officer was already stationed at the School, in the exact location Defendant Wilkinson so desired, but only on a part-time basis. Plaintiff further insisted that a full-time Resource Officer appointment would *not* have prevented the Accident and that such appointment did not represent the best use of limited Police resources. Defendant Wilkinson argued with Plaintiff, claiming, for example, that the Police Department *did* possess sufficient resources because she personally witnessed—on one occasion— a Police vehicle drive past the school, sirens on, at a time she now requested additional Police help. Plaintiff responded to Defendant Wilkerson with another request of his own: that Defendant Wilkinson does her work and continue to allow Plaintiff to do his. This offended Defendant Wilkinson.

86. No vote among the Board Members or formal proposal to alter Police deployments at the Town Elementary School or otherwise affect Defendant Wilkinson's off-the-cuff request was ever made to Plaintiff; accordingly, Plaintiff did not implement Defendant's requested changes.

87. There were a number of other disagreements which may have occurred during the three (3) years in which Plaintiff served as the Police Chief. Disagreements in the manner in which a small town's police department operates are to be expected.

88. Nonetheless, none of Defendant's contrived complaints, or any of the concerns raised by Defendants during the Meeting, validate or support Plaintiff's purported "for cause" termination. Plaintiff was simply the victim of a purposeful effort by the Defendants to remove

him from power within the Town and otherwise silence him when he refused to otherwise resign from his position.

### *Plaintiff's Notice of Tort Claims*

89.     On August 20, 2021, Plaintiff submitted to Defendants a Notice of Tort Claims, therein notifying Defendants of (*i*) potential claims relating to Defendants' wrongful termination of Plaintiff "in retaliation for his free speech rights" and (*ii*) various tort and constitutional claims arising/resulting in connection with such termination. A copy of this Notice is attached hereto as EXHIBIT 1. This Notice was served upon the Town Clerk on September 1, 2021. See Receipt, EXHIBIT 2.

90.     Defendants failed to respond in any way, shape, or form to Plaintiff's Notice within ninety (90) days; therefore, Plaintiff's claims identified therein are deemed *denied* as a matter of law. 51 O.S. § 157(A).

### **CAUSE OF ACTION**
### BREACH OF CONTRACT
### *(Against Defendant Town)*

91.     Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 91 above as if fully set forth and restated herein.

92.     Plaintiff entered into an employment contract with Defendant Town governing the conditions and obligations of each Party in connection with Plaintiff's employment as Chief of Police (hereinafter, "the Contract").

93.     The Town breached the terms of this Contract by firing Plaintiff without cause *and* in retaliation for his (*i*) engaging in protected speech regarding a matter of local concern (*i.e.*, inconsistencies in the Town's finances and potential misconduct); and (*ii*) whistleblowing as to

the ongoing, rampant financial mismanagement plaguing the Town through communications with both the OSBI and other members of the Town, including, but not limited to Sarah.

94.    The Town's breach caused Plaintiff injuries in an amount exceeding $125,000.00, including lost wages and earnings which would have accrued in connection with the Contract but for Defendants' wrongful retaliatory action, mental and emotional distress/anguish, and reputational harm.

**CAUSE OF ACTION**
WRONGFUL TERMINATION
*(Against All Defendants)*

95.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 5 above as if fully set forth and restated herein.

96.    Defendants wrongfully terminated Plaintiff in retaliation for his performing an act consistent with the State of Oklahoma's clear and compelling public policy.

97.    Specifically, Defendants fired Plaintiff in retaliation for his *(i)* engaging in protected speech regarding a matter of local concern (*i.e.*, inconsistencies in the Town's finances and potential misconduct); and *(ii)* whistleblowing as to the ongoing, rampant financial mismanagement plaguing the Town.

98.    Defendants' retaliatory action plainly contravened the purpose and letter of Okla. Const. Art. 2 § 22 *and* 74 O.S. § 840-2.5, the Whistleblower Act, respectively.

99.    Defendants' retaliatory action also constitutes a separate violation of Plaintiff's First Amendment right to engage in protected speech addressing matters of public concern.

100.    At all pertinent times, Defendants acted intentionally, willfully, maliciously, and/or in bad faith in derogation of Plaintiff's rights *and* Oklahoma public policy.

101.   Defendants' actions caused Plaintiff to suffer injuries in an amount exceeding $125,000.00, including lost wages and earnings which would have accrued but for Defendants' wrongful retaliatory action, mental and emotional distress/anguish, and reputational harm in his community.

**CAUSE OF ACTION**
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)
*(Against All Defendants)*

102.   Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 102 above as if fully set forth and restated herein.

103.   Defendants' wrongful termination of Plaintiff and public misrepresentation that the Town possessed grounds for same in complete disregard of his constitutional and statutory rights constituted extreme and outrageous conduct.

104.   Defendants' actions actually and proximately caused Plaintiff extreme emotional and mental distress and anxiety beyond that which any reasonable person should be expected to endure.

105.   At all pertinent times, Defendants knew or should have known their termination of Plaintiff was substantially certain to cause extreme emotional and mental distress and otherwise acted intentionally, willfully, maliciously, and/or in bad faith.

106.   As a result of Defendants' conduct, Plaintiff has suffered actual injuries in an amount exceeding $125,000.00, including significant emotional and mental distress, discomfort, and anxiety.

## CAUSE OF ACTION
TORTIOUS INTERFERENCE WITH CONTRACT
(*Against the Board Members*)

107.   Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 107 above as if fully set forth herein.

108.   Plaintiff entered into the Contract with Defendant Town governing the conditions and obligations of his employment.

109.   The Defendant Board Members knew *or* reasonably should have known about the existence and force of the Contract.

110.   By spreading misinformation about Plaintiff's conduct in office as Police Chief within the Town and among the other members of the Town's Board of Trustees, all in an effort to cover up fiscal discrepancies in the Town's finances and otherwise ensuring Plaintiff's firing, the Board Members unduly interfered with the Parties' performances under the Contract.

111.   The Board Members' conduct was intentional and otherwise deployed an improper or unfair means of interfering with the ongoing performance of each Party's obligations pursuant to the Contract.

112.   As an actual and proximate result of the Board Members' tortious interference, Plaintiff suffered significant damages in an amount exceeding $125,000.00, including financial losses in connection with Plaintiff's termination (*i.e.*, lost wages), and mental and emotional distress and anxiety, and reputational harm.

## CAUSE OF ACTION
DEFAMATION
(*Against All Defendants*)

113.   Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 113 above as if fully set forth and restated herein

114.    Defendants communicated false, damaging statements to third parties, painting Plaintiff's performance as Police Chief in a grossly negative light and otherwise attributing unlawful or unethical acts of misconduct to Plaintiff.

115.    The parties to whom Defendants communicated these false statements explicitly knew *or* reasonably understood the statements to be about Plaintiff.

116.    At all pertinent times, Defendants knew such statements were false *or* at least entertained serious doubts as to the veracity of these statements.

117.    Defendants' statements exposed Plaintiff to public contempt, ridicule, and/or disgrace, deprived Plaintiff of public confidence in his community, and/or injured Plaintiff in his occupation (as Plaintiff was terminated in connection with Defendants' promulgated falsehoods). Said falsehoods further damaged Plaintiff's ability to obtain employment in law enforcement.

118.    At all pertinent times, Defendants acted intentionally, willfully, maliciously, and/or in bad faith in derogation of Plaintiff's rights *and* Oklahoma public policy.

119.    Defendants' actions caused Plaintiff injuries in an amount exceeding $125,000.00, including financial losses resulting from Defendants' injury to his employment, *i.e.*, lost wages and economic opportunity, mental and emotional distress and anxiety, and reputational harm.

## CAUSE OF ACTION
VIOLATIONS OF 42 U.S.C. § 1983
(*Against Defendant Board Members*)

### *Violations of the Fifth and Fourteenth Amendments*

120.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 120 above as if fully set forth and restated herein.

121.    The Fifth and Fourteenth Amendments provide that no person shall be deprived of "life, liberty, or property, without due process of law." Oklahoma adopted and ratified the United

Stated Constitution on November 16, 1907. The Fifth and Fourteenth Amendments were adopted and enshrined in the Oklahoma Constitution at Article 2 § 7.

122.   Plaintiff retained a property interest in his continued gainful employment as Chief of Police for the Town.

123.   The Board Members failed to furnish Plaintiff with (*i*) adequate notice of the Special Meeting at which the Board intended to discipline Plaintiff (via termination of his employment); (*ii*) adequate notice of the agenda for such Special Meeting; (*iii*) any real opportunity to defend himself or his actions as Chief of Police of the Town; and (*iv*) any materials relied upon by the Board Members in reaching their disciplinary/termination decision.

124.   Prior to firing Plaintiff, the board members failed to provide Plaintiff with the minimum due process requirements guaranteed by the U.S. Constitution. *See* AMEND. V. XIV.

125.   The Board Members, prior to firing Plaintiff, failed to provide Plaintiff with the minimum notice and procedure requirements provided by even their own Town Ordinances, themselves designed to reflect the Town's constitutional obligations.

126.   At all times pertinent hereto, Board Members acted intentionally, willfully, maliciously, and/or in conscious disregard of Plaintiff's rights.

127.   In terminating Plaintiff's employment as Chief of Police for the Town, the Board Members acted under color of state law.

128.   The Board Members' actions caused Plaintiff injuries in an amount exceeding $125,000.00, including financial harm resulting from Plaintiff's termination, emotional and mental distress and anxiety, and reputational harm.

*Violations of First Amendment*

129.   As Chief of Police for the Town, Plaintiff was a public employee.

130.   The First Amendment provides public employees the right to be free from retaliation for engaging in speech on matters of public concern. Oklahoma adopted and ratified the United Stated Constitution on November 16, 1907. The First Amendment was adopted and enshrined in the Oklahoma Constitution at Article 2 § 22.

131.   In September 2020, Plaintiff referred to OSBI an investigation relating to findings by the State Auditor's Office indicating the Town suffered from serious internal control deficiencies leading to discrepancies in the Town's financial records.

132.   Thereafter, Plaintiff consistently raised the issue with Defendants and otherwise addressed the matter by speaking out publicly with other members of the community, including Town employees.

133.   The Board Members fired Plaintiff in retaliation for his engaging in protected speech addressing a matter of public concern, *i.e.*, for Plaintiff's speaking out regarding the Town's documented history of financial mismanagement and reported financial discrepancies in the Town's books and records. *See* U.S. CONST. AMEND. I.

134.   At all times pertinent hereto, the Board Members acted intentionally, willfully, maliciously, and/or in conscious disregard of Plaintiff's rights.

135.   In retaliating against Plaintiff by terminating his employment as Chief of Police for the Town, the Board Members acted under color of state law.

136.   The Board Members' actions caused Plaintiff injuries in an amount exceeding $125,000.00, including financial harm resulting from Plaintiff's termination, emotional and mental distress and anxiety, and reputational harm.

**CAUSE OF ACTION**
DUE PROCESS VIOLATIONS, OKLA. CONST. ART. 2, § 7
*(Against All Defendants)*

137.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 137 above as if fully set forth and restated herein.

138.    The Oklahoma State Constitution, Art. 2, § 7, states that "[n]o person shall be deprived of life, liberty, or property, without due process of law.

139.    Plaintiff retained a property interest in his continued gainful employment as Chief of Police for the Town.

140.    Prior to his termination on May 25, 2021, Plaintiff received initial notice of the previously unscheduled meeting wherein Defendants ultimately fired Plaintiff just the day *prior* to the actual occurrence of the same—on May 24, 2021. On that date, Plaintiff was *not* informed of any grounds for Defendants' intention to terminate his employment.

141.    It was not until after the close of business on May 24, 2021, Plaintiff was provided any information that his employment was even at risk.

142.    The Board Members, prior to firing Plaintiff, failed to provide Plaintiff with the minimum notice and procedure requirements provided by even their own Town Ordinances, themselves designed to reflect the Town's constitutional obligations.

143.    The Meeting, called for the purpose of terminating Plaintiff's employment, lasted just two-and-a-half hours, and the Board Members spent all but approximately thirty (30) minutes in executive session, *i.e.*, behind closed doors and away from public view, absent even the Plaintiff's presence.

144.    For the short time period in which the Board Members were not in executive session, they invited Plaintiff to join the meeting *alone*, albeit simultaneously denying admission and/or access to the meeting to Plaintiff's legal counsel—who was present, ready to attend.

145.    Plaintiff did not receive adequate notice of his proposed termination, nor did the Board Members provide Plaintiff with a fair opportunity to be heard prior to his firing. Defendants, therefore, violated Plaintiff's right *not* to be deprived of property absent due process.

146.    Due to Defendants' violations of Plaintiff's rights, Plaintiff suffered significant injuries in an amount exceeding $125,000.00, including financial losses in connection with his termination as Police Chief for the Town, mental distress and anxiety, and reputational harm.

## CAUSE OF ACTION
CONSPIRACY
(*Against All Board Members*)

147.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 147 above as if fully set forth and restated herein.

148.    Defendant Board Members collectively conspired to—and *did*—knowingly, intentionally, maliciously, and in bad faith undertake the tortious and wrongful actions herein described, including the following:

    **a.**    firing Plaintiff in retaliation for: (a) his engaging in protected speech regarding a matter of local concern (*i.e.*, inconsistencies in the Town's finances and potential misconduct); and (b) whistleblowing as to the ongoing, rampant financial mismanagement plaguing the Town;

    **b.**    unduly interfering with Plaintiff's employment relationship with the Town, culminating in the ultimate interference: Plaintiff's wrongful termination as Chief of Police;

      **c.**      defaming and otherwise harming Plaintiff's reputation *via* the publication of knowingly false statements related to his conduct as Chief of Police; *and*

      **d.**      violating Plaintiff's State and Federal Rights to Speech and Due Process by (a) firing Plaintiff without legitimate justification and in retaliation for his engaging in protected speech addressing a matter of public concern; and (b) depriving Plaintiff of an expected property interest—his ongoing, gainful employment—without notice, any opportunity for Plaintiff to defend himself, or any real justification.

149.    Defendants agreed expressly, impliedly, and/or tacitly to undertake these actions in advance of the Meeting in which Defendants ultimately fired Plaintiff, *i.e.*, there was a meeting of the minds with respect to Defendants collectively achieving the wrongful objects listed above (the "Agreement").

150.    Defendants undertook overt actions to achieve the unlawful, wrongful, and tortious objects of the Agreement, including, but not limited to, Defendants' surprise termination of Plaintiff in unabashed retaliation for his protected speech, in derogation of his due process rights, and tortious interference with his employment contract with the Town.

151.    Due to the Board Members' violations of Plaintiff's rights, Plaintiff suffered significant injuries in an amount exceeding $125,000.00, including financial losses in connection with his termination as Police Chief for the Town, mental distress and anxiety, and reputational harm.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff prays this Court grant him judgment against Defendants in connection with the foregoing claims in an amount exceeding $125,000.00, together with any and all pay, benefits, and emoluments Plaintiff would have otherwise been entitled to but

for Defendants' retaliatory discharge of Plaintiff as the Town's Police Chief; punitive damages; costs and fees incurred in bringing this action (*including* attorney's fees); and pre-judgment and post-judgment interest, along with such other and further relief as this Court deems just and proper.

Respectfully Submitted,

Justin R. Williams, OBA No. 32539
Wyatt McGuire, OBA No. 34720
Matthew Taylor, OBA No. 34808
OVERMAN LEGAL GROUP, PLLC
809 NW 36th Street
Oklahoma City, Oklahoma 73118
Telephone:      (405) 605-6718
Facsimile:      (405) 605-6719
Email:          justinwilliams@overmanlegal.com
                wyattmcguire@overmanlegal.com
                matthewtaylor@overmanlega.com
**ATTORNEYS FOR PLAINTIFF**

**ATTORNEY LIEN CLAIMED**

# Exhibit 1



OVERMAN
LEGAL GROUP

August 20, 2021

*Submitted Via Email and Certified Mail*
Town of Jones City
Board of Trustees
c/o Mr. Ray Poland, Mayor
100 E. Main Street
Jones, Oklahoma 73049
rpoland78 @ gmail.com

   Re: Notice of Tort Claims—Robert Williams

Mr. Ray Poland, Mayor of the Town of Jones City:

   I am writing on behalf of my firm's client, Mr. Robert Williams ("Robert"), pursuant to 51 Okla. Stat. § 156, to provide notice of tort claims against the Town of Jones City ("Jones").

   Jones' termination of Robert's position as Chief of Police through the Jones Board of Trustees on May 25, 2021 was unlawful and in retaliation for his free speech rights to speak out on matters of public concern. The evidence demonstrating the true (and wrongful) purpose for terminating Robert's employment is substantial, damning, and irrefutable. Jones' interests and finances have been repeatedly abused by those who purport to work towards the preservation of its status as a wonderful place to live, work, and raise a family. Robert sought to shine light on these abuses and preserve Jones' assets for its future—for his children and grandchildren. The Board of Trustees nonetheless determined to abdicate its duty to uncover and correct these wrongs, worked to cover them up, and in so doing, intentionally and purposefully harmed Robert's reputation. It did this when it could have simply acknowledged the problem. One wonders what purpose the Board of Trustees' behavior could have possibly furthered? The only rational conclusion is that it would prefer to preserve its members' reputations, or that of their friends, neighbors, family members, and even their wives (in certain notable instances) rather than follow Oklahoma and federal law.

   Jones' failure to abide by its own ordinances respecting due process in a pre-disciplinary hearing also violated Robert's due process rights. These actions, taken in furtherance of shutting down Robert's legitimate speech on issues of fiscal mismanagement in Jones, amounted to defamation of Robert's character and tortious interference with his employment contract. Further purported pretextual bases for Robert's termination were also defamatory and have led to direct loss and embarrassment to Robert.

   The wrongful actions taken by Jones can be corroborated and proven through eyewitness testimony regarding the conduct of Jones' Mayor, his wife, current and former Jones Board of

Trustees officials and related persons in seeking to silence Robert's protected speech, due process rights, character, and employment contract. As this dispute proceeds, it should at all times be remembered that you, Mr. Poland, and your peers within Jones, brought this upon yourselves in an effort to silence those who would reveal gross abuses and mismanagement of taxpayer funds. Jones' caretakers cannot be permitted to abscond with tax revenues for their personal interests, or otherwise lack any oversight over their management such that those funds could go unaccounted for. It is time to finally address this betrayal of the public trust, and Robert's claim will be the vehicle through which this justice is accomplished.

Of course, Robert is not simply representative of those who must endure Jones' mismanagement of its funds and resources. Because of Jones' acts and failures, Robert has personally suffered extensive injury and damage as a direct and proximate cause of Jones' handling of his employment. As such, he states a claim for the maximum recoverable amount permitted under the Oklahoma Governmental Torts Claims Act, 51 Okla. Stat. § 154, *et seq*. Nothing in this letter should be construed as a waiver by Robert of any claim, amount, method, or avenue of recovery to which he is legally entitled. Please note the Appendix on the following page lists all claimants, along with their required information, per 51 Okla. Stat. §§ 151-172.

Mr. Poland, should Jones deny Robert's claim or otherwise fail to resolve it to his satisfaction, yours and the Trustees' relationship to this dispute will be at the forefront of the dispute and resulting litigation. Accordingly, in addition to the Town, yourself and each member of Jones' Board of Trustees is hereby commanded to preserve any and all evidence—including electronically stored information ("ESI")—as may be relevant to Robert's claims and this pending dispute (all such evidence, including ESI hereinafter referred to as the "Evidence"). This Evidence includes not only your professional accounts and records for the Town, but any personal documents, correspondence, and accounts within which one may find relevant Evidence. To that point, we're asking that you preserve all Evidence as *may potentially* be relevant to Robert's claims. This would certainly include any Evidence that includes or relates to documents and communications with any Board of Trustees members, attorneys, auditors, employees, or other third-parties regarding not only Robert's employment, but (a) Robert's predecessor's employment; (b) Jones' finances; (c) any and all audit or investigation concerning said finances; (d) the termination of employment of all prior Jones' employees for the preceding five (5) years; (e) case and investigative files concerning any inquiry or investigation performed by Jones or any of its agents or employees into the mishandling of town funds; (f) case and investigative files concerning any inquiry or investigation performed by Jones or any of its agents or employees into deficiencies in the handling of Jones' police departments' use of funds or misconduct related to its employees; as well as (g) any other or further records which may be relevant to the subject dispute regarding Robert's employment, accompanying investigation into the misuse of Jones' revenues, and his subsequent termination.

Your obligation to preserve Evidence requires that you take appropriate steps to preserve and protect all potentially relevant information stored on Your current and former telephone, computer systems, and other media and devices (including personal digital assistants, voice-messaging systems, online repositories, cell phones, and tablet devices). Evidence and ESI should be given the broadest possible definition and includes, but is not limited to, potentially relevant information electronically, magnetically, or optically stored. The following is a nonexclusive list of examples of ESI:

- Digital communications (e.g., e-mail, voice mail, instant messaging, and social media messages);
- Digital Images (e.g., TIFF, .JPG, .GIF images);
- Documents (e.g., Word or WordPerfect documents and drafts, PDFs);
- Video or Sound Recordings (e.g., .WAV, .MP3, .AVI, .MOV files); and/or
- Archival Files (e.g., .ZIP, .GHO).

Evidence, including ESI, may be stored not only in areas reasonably accessible to you, but also in areas you may deem not reasonably accessible, such as third-party servers or cloud computing databases. You are obliged to preserve potentially relevant evidence from both of these sources of Evidence, even if you do not anticipate producing such Evidence. You are further obligated to preserve and maintain any account data, user data, messages, and postings to web-based platforms.

You must act, immediately, to preserve potentially relevant Evidence. Adequate preservation of Evidence requires more than simply refraining from efforts to destroy or dispose of such evidence. You must also intervene to prevent loss due to routine operations and employ proper techniques and protocols suited to protection of Evidence. Be advised that sources of Evidence may be altered and erased by continued use of your computers and other devices. Booting a drive, examining its contents, or running any application will irretrievably alter the evidence it contains and may constitute unlawful spoliation of evidence. Consequently, alteration and erasure may result from your failure to act diligently and responsibly to prevent loss or corruption of Evidence. You are directed to immediately initiate a litigation hold for potentially relevant Evidence, documents, and tangible things, and to act diligently and in good faith to ensure and document compliance with such litigation hold. You are further directed to immediately identify and modify or suspend features of your information systems and devices that, in routine operation, operate to cause the loss of potentially relevant Evidence. You should also take affirmative steps to prevent anyone with access to your data, systems, and archives from seeking to modify, destroy, or hide electronic evidence on network or local hard drives, as any such spoliation may be imputed to you.

You should further anticipate the need to disclose and produce system and application metadata and act to preserve it. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location and dates of creation and last modification or access. Application metadata is information automatically included or embedded in electronic files but that may not be apparent to a user, including deleted content, draft language, commentary, collaboration and distribution data and dates of creation and printing. Be advised that metadata may be overwritten or corrupted by careless handling or improper steps to preserve ESI. For electronic mail, metadata includes all header routing data and Base 64 encoded attachment data, in addition to the To, From, Subject, Received Date, CC and BCC fields. You must also preserve any passwords, keys or other authenticators required to access encrypted files or run applications required to access the ESI.

As hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions. If information exists in both electronic and paper forms, you should preserve both forms.

3

Your preservation obligation also extends beyond Evidence in your care, possession, or custody and includes Evidence in the custody of others that is subject to your direction or control. Accordingly, you must notify any current or former agent, attorney, employee, custodian, or contractor in possession of potentially relevant Evidence to preserve such Evidence to the full extent of your obligation to do so, and you must take reasonable steps to ensure their compliance.

We are available to discuss reasonable preservation steps, however, you should not defer preservation steps pending such discussions if Evidence may be lost or corrupted as a consequence of delay. Should your failure to preserve potentially relevant evidence result in the corruption, loss or delay in production of evidence to which Robert is entitled, such failure would constitute spoliation of evidence, and we will pursue appropriate remedies.

Nothing in this demand for preservation of Evidence should be understood to diminish a party's obligation (or counsel's concurrent obligation) to preserve documents, tangible things, and other potentially relevant evidence. Please confirm to us in writing that you have taken the steps outlined in this letter and demand for litigation hold to preserve Evidence and tangible documents potentially relevant to this action. If you have not undertaken the steps outlined above, or have taken other actions, please describe what you have done to preserve potentially relevant evidence. In addition, if you have manipulated, altered, deleted, destroyed, or in any way modified any Evidence that is relevant or potentially relevant to this case, we ask you to disclose as much immediately. Failure to act immediately may be regarded as an attempt to destroy Evidence and we will seek appropriate remedies.

Please contact myself or Justin Mai of this office promptly should you believe that any part of this letter is confusing, unclear, or inadequate to provide notice of our client's claims as required by law. Our office is empowered to negotiate Robert's claims and his behalf.

Thank you for your attention. We look forward to your response.

Sincerely,

Justin M. Mai, Esq.
Justin R. Williams, Esq.
-For the Firm-
Overman Legal Group, PLLC
809 NW 36th Street
Oklahoma City, Oklahoma 73118
(Telephone): 405.605.6718
(Facsimile): 405.605.6719
(Email):justinwilliams@overmanlegal.com
justinmai@overmanlegal.com
ATTORNEYS FOR ROBERT WILLIAMS

4

cc:   Justin Mai (justinmai@overmanlegal.com)
      Cheri Cooksey (chericooksey@overmanlegal.com)
      City of Jones Clerk (twallace@jonescityok.org)
      City of Jones Board of Trustees (Ray Poland, trustee1@jonescityok.org; Chris Calvert,
      trustee2@jonescityok.org; Frank Koehler, trustee3@jonescityok.org; Casey Burwell,
      trustee4@jonescityok.org; Missy Wilkinson, trustee5@jonescityok.org)

### Appendix: List of Claimants

| CLAIMANT | ADDRESS | TELEPHONE |
|---|---|---|
| Robert Williams, whose attorneys identified herein are authorized to negotiate this dispute on his behalf. | 10200 N. Post Road, Jones, OK 73049 | (405) 334-3634 |

# Exhibit 2

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Town of Jones
c/o City Clerk
40 City Hall
110 E. Main St.
Jones, OK 73049

9590 9402 6413 0303 0972 88

2. Article Number (Transfer from service label)

7020 2450 0002 0151 3697

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Tammy Wallace
☐ Agent
☐ Addressee

B. Received by (Printed Name)
Tammy Wallace
C. Date of Delivery
9/1/21

D. Is delivery address different from item 1? ☒ Yes
If YES, enter delivery address below: ☐ No

PO Box 720
Jones, OK 73049

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053

Domestic Return Receipt